# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.  13 CR 660 |
| | ) | |
| ADRIANA GALLARDO (FLORES), | ) | |
| ANGEL AGUILAR | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant Angel Aguilar's ("Aguilar") motion to suppress his post-arrest statements.  For the following reasons, the Court denies Defendant's motion.

## BACKGROUND

On August 15, 2013, the grand jury returned a nine-count indictment against Aguilar and Defendant Adriana Gallardo Flores ("Flores") alleging money laundering and structuring offenses under 18 U.S.C. § 1956 and 31 U.S.C. § 5324 (R. 1, Indictment.)  The government arrested Flores on May 29, 2013, pursuant to a criminal complaint.  (R. 36-2, Criminal Compl.) Flores made statements to the government following her arrest, and filed a motion to suppress those statements on March 14, 2014.

As discussed in more detail in the Court's October 21, 2014 Memorandum Opinion and Order (R. 56, the "October 2014 Opinion"), the court[1] held a hearing on Flores's motion to suppress over two days beginning on May 13, 2014.  After hearing testimony from a number of witnesses, including Flores, the court suppressed Flores's post-arrest statements.  Specifically,

---

[1] This case was originally assigned to the Hon. John F. Grady, who heard Flores's motion to suppress and ruled on May 14, 2014.  This case was reassigned to this Court on August 8, 2014. (R. 47.)  Accordingly, this opinion uses the uncapitalized "court" when referring to arguments presented to or decisions made by Judge Grady, and the capitalized "Court" when referring to arguments presented to or decisions made by this Court.

the court found that: 1) Flores invoked her right to counsel at the scene of the arrest; (R. 40, 5/14/2014 Tr. 52-53) 2) Flores invoked her right to counsel again after the government brought her to the DEA offices; (*Id*. 53-54) and 3) the law enforcement officers' conversation with Flores at the DEA offices before Flores waived her *Miranda* rights constituted a custodial interrogation because it was intended to induce Flores to waive her rights and make incriminating admissions in response. (*Id*. 54-56; 65.) The court also suppressed evidence found by law enforcement on Flores's cell phone and during a later search of her office and residence as "fruit of the poisonous tree" derived from Flores's suppressed statements. (*Id*. 65-66.)

On August 6, 2014, the government filed a motion to narrow the court's May 14, 2014 suppression ruling. (R. 45.) For the reasons detailed in the Court's October 2014 Opinion, it granted the government's motion. The Court found that because Flores invoked her right to counsel at the scene of her arrest and did not re-initiate communication with law enforcement, the court did not need to reach any additional possible bases for suppression. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Court ordered that Flores's post-arrest statements in the interview at the DEA office, and any evidence obtained in the subsequent searches of Flores's office, residence, and cell phone remain suppressed.

Aguilar now moves to suppress statements that he made to law enforcement officers that he contends were derived from Flores's suppressed post-arrest statements. In support of his motion, Aguilar alleges the following facts, which the government does not contest. After the government arrested Flores on May 29, 2013, the officers showed her photographs of an individual taken from Wells Fargo branches in the Chicago area. Flores identified this person as her son, Defendant Aguilar. Flores also told agents that Aguilar made at least one deposit for her

at a Wells Fargo bank.  On August 20, 2013, IRS agents arrested and interrogated Aguilar, and asked him similar questions regarding the alleged money laundering scheme.

Aguilar argues that the Court should suppress the statements he made to the government on August 20, 2013 because the government focused on Aguilar as a result of the now-suppressed statements of Flores.  Without Flores's statements, Aguilar contends that the government would never have "zeroed in" on him.  (R. 60, Def.'s Mot., at 2.)  Aguilar does not argue that the government took his statements in violation of his *Miranda* rights, or any other bases for suppression.

### LEGAL STANDARD

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  To protect this privilege against self-incrimination, the Supreme Court held in *Miranda v. Arizona* that "a suspect must be informed of, and voluntarily waive" his Fifth Amendment rights, including the right to counsel, "before being subjected to custodial interrogation." *United States v. Robinson,* 586 F.3d 540, 545 (7th Cir. 2009) (citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *see also United States v. Pelletier,* 700 F.3d 1109, 1114 (7th Cir. 2012) ("*Miranda v. Arizona* requires police to read a series of warnings to suspects before putting them through custodial interrogation.").

### ANALYSIS

Aguilar moves to suppress his statements because the government allegedly targeted him as a result of information it learned from Flores's suppressed post-arrest statements.  In response, the government makes several arguments.  First, it argues that Aguilar does not have standing to

object to violations of Flores's constitutional rights.[2]  Second, the government contends that it

had information that independently led it to approach Aguilar and take his statement apart from

the information it learned from Flores.[3]

## I.        Constitutional Rights of Defendant Aguilar

The government first argues that Aguilar does not have standing to suppress the

statements at issue based on violations of Flores's *Miranda* rights.  The Supreme Court has long

held that "the privilege against compulsory self-incrimination should be limited to its historic

function of protecting only the natural individual from compulsory incrimination through his

own testimony or personal records."  *Bellis v. United States*, 417 U.S. 85, 89-90, 94 S.Ct. 2179,

40 L.Ed.2d 678 (1974) (quotation omitted).  "Generally, individuals not personally the victims of

illegal government activity cannot assert the constitutional rights of others."  *United States v.*

*Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984) (citing *United States ex rel. Cunningham v.*

*DeRobertis,* 719 F.2d 892, 895-96 (7th Cir. 1983)); see also *United States v. Hurt*, 92 F.3d 1188,

at *2 (7th Cir 1996) (unpublished).  Although a violation of a non-defendant's Fifth Amendment

rights may result in a fundamentally unfair trial for the defendant "when the government seeks a

conviction through use of evidence obtained by extreme coercion or torture," *Chiavola*, 744 F.2d

at 1273, neither Aguilar nor Flores has ever alleged that the government's actions rose to that

level of misconduct.

---

[2] As the government notes, the Supreme Court has stated that this analysis is more properly framed as whether the government has infringed an individual's personal constitutional rights, rather than whether that individual has standing to object to the violation of the constitutional rights of another.  *See Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (discussing standing in Fourth Amendment context).  The Court uses the term "standing" here only for the purpose of convenience, and consistently with the guidance of the Supreme Court.

[3] The government also argues that the exclusionary rule does not apply to derivative evidence recovered as a result of information it obtains in violation of an individual's rights under *Miranda* or *Edwards*.  Because the Court rules in favor of the government on the first two issues, the Court does not address this third issue.

Further, the Seventh Circuit has distinguished between evidence obtained in violation of the Fifth Amendment rights of another that is introduced at trial, from information that merely aides in the investigation of a crime but is not introduced as evidence. In *United States ex rel. Cunningham v. DeRobertis*, the Seventh Circuit held, in part, that the defendant did not have a basis to exclude derivative evidence that the government obtained from the allegedly coerced confession of another where the government did not introduce the coerced statements themselves at the defendant's trial. *DeRobertis*, 719 F.2d at 896. The court explained that "[w]hile the confession may have aided in the investigation of the crime, this use presents no basis for relief…if there was nothing improper about the trial itself." *Id*.

Here, the government is not seeking to introduce the suppressed statements made by Flores into evidence against Aguilar. Instead, the government, at most, used information from Flores's suppressed statements in the investigation of Aguilar's alleged crime. Even assuming that the government would not have known to investigate Aguilar absent this information, this type of investigative use does not compel the suppression of Aguilar's statements. *See DeRobertis*, 719 F.2d at 896. Accordingly, the Court agrees with the government that Aguilar cannot suppress his statements here based on the government's violation of Flores's rights under *Miranda* and *Edwards*.

## II.    Independent Source Doctrine

The government also argues that the Court should not suppress Aguilar's statements because Aguilar was a target of the government's investigation prior to Flores making her suppressed statements. The government contends that it had sufficient evidence to approach Aguilar and take his statement independent of the information it learned from Flores following

her arrest.[4]  "[T]he independent source doctrine allows admission of evidence that has been

discovered by means wholly independent of any constitutional violation."  *United States v.*

*Gravens*, 129 F.3d 974, 981 (7th Cir. 1997) (quoting *Nix v. Williams*, 467 U.S. 431, 443, 104

S.Ct. 2501, 81 L.Ed.2d 377 (1984)).  "[T]he interest of society in deterring unlawful police

conduct and the public interest in having juries receive all probative evidence of a crime are

properly balanced by putting the police in the same, not a worse, position than they would have

been in if no police error or misconduct had occurred."  *United States v. Moody*, 664 F.3d 164,

167 (7th Cir. 2011) (quoting *Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 101

L.Ed.2d 472 (1988)).  "[T]he central question under the independent source doctrine is whether

the evidence at issue was obtained by independent legal means."  *Moody*, 664 F.3d at 167

(quoting *United States v. May*, 214 F.3d 900, 906 (7th Cir. 2000)).  When the government relies

on the independent source doctrine, it bears the burden of proof by a preponderance of the

evidence.  *See Gravens*, 129 F.3d at 982 (applying preponderance of the evidence standard to

independent source doctrine).

In *United States v. Gravens*, the defendant argued that the testimony of the defendant's

alleged accomplice against him should have been excluded at the defendant's trial because the

government's illegal interrogation of the defendant led it to his accomplice.  *Gravens*, 129 F.3d

at 980.  Earlier, however, the government had learned of the defendant's accomplice during a

lawful interrogation of the defendant in which he had waived his *Miranda* rights.  *Id*. at 981.

Accordingly, the Seventh Circuit held that the government had "untainted and independent

evidence" that the accomplice was involved in the alleged crime, "and that this evidence would

---

[4] Although the government relies upon the "inevitable discovery" doctrine in its briefing, the Court applies the closely related "independent source" doctrine based on the facts here.  *See United States v. Gravens*, 129 F.3d 974, 980-81 (7th Cir. 1997) (applying independent source doctrine to find that although police took unlawful statements from defendant that led them to his accomplice, earlier lawful statements provided independent source leading police to the accomplice that kept his testimony free from taint as "fruit of the poisonous tree.")

have been pursued as part of a standard criminal investigation." *Id*. Because "[t]he independent nature of the source" kept the accomplice's testimony "free from taint as 'fruit of the poisonous tree,'" the Seventh Circuit affirmed the district court's denial of the defendant's suppression motion on this basis. *Id*.

Similarly here, the government meets its burden to show that it had an independent source to approach Aguilar and obtain his statements. The government filed two DEA reports of investigation in support of its response. (*See* R. 66-1, 66-2.) Both reports detail information obtained well before the interview of Flores on May 29, 2013 that would have led the government to Aguilar. The first report states that on September 21, 2012, an undercover DEA officer entered Flores's currency exchange[5] and gave Flores a backpack containing $150,000 in U.S. currency. (R. 66-1, at 1.) Flores removed the cash and "split it up between her and her son, who was a Hispanic male, approximately 18 years of age, 5'7" and 180 lbs., light skin complexion, short black hair and no facial hair. Both [Flores] and her son began to count money from two separate money counters." (*Id*.) After counting the money, Flores produced two separate receipts, "one for $150,000 and the other for $150,000 minus the $15,000 which she charged for laundering the money." (*Id*.)

The second report describes events taking place on January 8, 2013. (R. 66-2.) Again after entering Flores's currency exchange, the undercover DEA officer asked Flores about $13,000 that was "still missing." (*Id*., at 1.) In response, Flores asked about several deposits, including a $4,000 deposit. (*Id*.) Flores then pointed to her son, who stated "that he made the $4,000 deposit and he still had the receipt in the car." (*Id*.) He then "exited the business and returned with the receipt which he then handed over" to the undercover DEA officer. (*Id*.) The

---

[5] The government states that Flores owns a currency exchange located in Chicago, "Gallardo's 1 Stop Services." (R. 62, Gov. Resp., at 2.)

government notes that Flores's son who is referred to in both reports is Defendant Aguilar. (*See* R. 62, Gov.'s Resp., at 2-4.) This information clearly provided the government with a reason to approach Aguilar well before Flores's post-arrest statements.

In Aguilar's motion, he cursorily argues that the only evidence that the government possessed pointing to him (apart from Flores's statements) was photos of him in various Chicago-area branches of Wells Fargo. (R. 60, Mot. at 2.) After the government filed its response describing the additional evidence above, however, Aguilar chose not to file a reply. He does not otherwise contest that the government possessed this information before obtaining Flores's suppressed statements. For these reasons, the Court finds that the government had an independent, "untainted" basis on which to approach Aguilar and take his statements apart from the information in the suppressed statements given by Defendant Flores. Accordingly, the Court denies Aguilar's motion to suppress his statements on this basis as well.

**CONCLUSION**

For the foregoing reasons, the Court denies Defendant Aguilar's motion to suppress.


**DATED: January 15, 2015**                                          **ENTERED**

AMY J. ST EVE
U.S. District Court Judge