# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| ) | Case No. 13 CR 660-1 |
| v. ) | |
| ) | |
| ) | |
| ADRIANA GALLARDO ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Adriana Gallardo has moved for a judgment of acquittal, or, in the alternative, a new trial on Counts One through Nine of the Indictment. For the reasons explained in detail below, the Court denies Defendant's motion.

## BACKGROUND

On August 15, 2013, the grand jury returned a nine-count indictment against Defendant Adriana Gallardo ("Gallardo" or "Flores") and her son Angel Aguilar ("Aguilar") alleging seven counts of money laundering (Counts One through Seven) and two counts of structuring offenses (Counts Eight and Nine) under 18 U.S.C. § 1956 and 31 U.S.C. § 5324 (R. 1, Indictment.) The Indictment charged Gallardo with laundering approximately $200,000 that an undercover officer and a confidential informant had represented to be the proceeds of illegal drug activity. They delivered the $200,000 to Gallardo at her currency exchange in two bundles on August 1, 2012 and September 21, 2012.

Defendant Gallardo[1] proceeded to a jury trial on March 9, 2015. During the trial, the government called the following witnesses: Special Agent Chris Labno of the Bureau of Alcohol,

---
[1] Defendant Aguilar pled guilty to a Superseding Information before trial. (R. 97.)

Tobacco, and Firearms ("ATF") who testified as an expert about narcotics traffickers and money laundering; Federal Bureau of Investigations ("FBI") Staff Operations Specialist Kevin Hegi; Undercover Drug Enforcement Administration ("DEA") Task Force Officer Carlos Huertas; Barbara Duffy from the Department of Treasury, Financial Crime Enforcement Network; Loreto Salazar from Intermex; and Internal Revenue Service ("IRS") Special Agent Jennifer Kwiecinsk.

On March 12, 2015, the jury returned a verdict of guilty on all nine counts. Defendant now seeks a judgment of acquittal and a new trial.

## ANALYSIS

### I. Defendant Is Not Entitled to Judgment of Acquittal

Defendant first argues that the Court should grant her a judgment of acquittal pursuant to Rule 29 because the government failed to prove beyond a reasonable doubt that she was predisposed to commit money laundering or that its agents did not induce Defendant to commit money laundering crimes. Defendant has failed to "convince the court that … 'no rational trier of fact could have found [her] guilty beyond a reasonable doubt.'" *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010).

#### A. Legal Standard

Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When, as here, a defendant makes a Rule 29(a) motion at the close of the government's case, and the court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *Warren*, 593 F.3d at 546; *see also United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg,* 640 F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United States v. Morris*, 576 F.3d 661, 665-66 (7th Cir. 2009). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren*, 593 F.3d at 546 (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012); *United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010) (stating that the inquiry is "whether evidence exists from which any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt"). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at 546.

It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). This strict standard is recognition that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547. The Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

### A. The Government Proved Beyond A Reasonable Doubt that Defendant Was Not Entrapped

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014). An entrapment defense contains two elements – "lack of predisposition and government inducement." *Id. See also United States v. Barta*, 776 F.3d 931, 933 (7th Cir. 2015). Defendant satisfied her burden of presenting her entrapment defense at trial for the jury to decide the factual question. *Mayfield*, 771 at 439-441. At trial, the government therefore had the burden of proving beyond a reasonable doubt either that the defendant was predisposed to commit the offense before she had contact with law enforcement officers or their agents or that law enforcement officers or their agents did not persuade or otherwise induce the defendant to commit the offense. *Id.* Viewing the evidence in the light most favorable to the government, the government proved both of these elements beyond a reasonable doubt.

The government introduced evidence at trial proving beyond a reasonable doubt that Defendant committed the crimes of money laundering and structuring through her store, Gallardo One Stop Services. DEA Task Force Officer Carlos Huertas testified regarding his undercover role in the case. Specifically Officer Huertas testified that he participated in the investigation of Defendant in an undercover capacity. Officer Huertas and a confidential source ("CS") posed as narcotics traffickers who needed to launder drug proceeds. Defendant knew the

4

CS and had dealt with him in the past. During a recorded conversation with the CS, the CS told Defendant Gallardo that he intended to send his associate -- who unbeknownst to Gallardo was Officer Huertas posing as a drug dealer -- to Defendant's business because he needed to launder narcotics proceeds. In response, Defendant told the CS to "have your cousin come here. I can take care of him here, but over the phone I do not …"

Officer Huertas testified how he laundered $50,000 through Defendant on August 1, 2012 and another $150,000 through Defendant on September 21, 2012. The government corroborated his testimony through recorded conversations depicting his discussions regarding the laundering with Defendant and with the CS. The government further established Defendant's guilt through, among other evidence, introduction of photographs from the scene, the backpack in which Officer Huertas transported the cash to Defendant, and the receipts Defendant provided Officer Huertas for the money. They further proved that Defendant either deposited or had the funds deposed in amounts under $10,000 into the Wells Fargo bank account.

Defendant does not challenge the sufficiency of the evidence to prove her guilty of the money laundering and structuring financial transactions. Instead, she contends that the government entrapped her and that the government failed to prove that she was predisposed to commit these crimes or that the government agents did not induce her to commit them. The Court addresses each argument in turn.

### 1. Predisposition

Viewing the evidence in the light most favorable to the government, the government proved beyond a reasonable doubt that Defendant was predisposed to commit the offense before she had contact with law enforcement officers or their agents. Defendant was predisposed to commit the offense before she had contact with law enforcement officers or their agents if she was ready and willing to commit the crime prior to the government's attempts to persuade her to

commit the crime or actively wanted to commit the crime, but had not yet found the means. *Mayfield*, 771 F.3d at 438. *See also United States v. Blitch*, 773 F.3d 837, 845-46 (7th Cir. 2014). Defendant's conduct after she encountered the government's agent was also relevant to the issue of predisposition. *Id.*

The recorded conversations introduced at trial demonstrated Defendant's predisposition to commit the crimes of money laundering and structuring. In a July 19, 2012, conversation, for example, the CS said to Defendant "but last time I went to see you, you told me, remember what you said? You said, 'yes, bring whatever you need to bring. I'm going to charge you ten percent, just like I charged the others.' That's what you told me." Defendant responded, "yes". (Gov. Ex. Transcript E.) The CS subsequently said to Defendant "You said, 'yes, I've done favors for my husband's friends. This is how much I charge for, for these things.'" Defendant responded, "Yes, but, but why are you calling me and telling me this over the phone?" (*Id.*) She then told the CS that he should come and talk to her in person, not on the phone: "If you need to talk, man, if you need to talk, come talk to me over here in person." (*Id.*) The evidence at trial further revealed that Defendant's husband was a drug dealer.

On August 1, 2012, Defendant had another conversation with the CS in which she discussed her prior money laundering activities. During that conversation, Defendant stated, "I make deposits for that man all the time … I have people that I make deposits to like that for … to bank accounts. But … I … He wanted … He was telling me … When you call me … you told me they were going to be [wire] transfers. He told me that everything was going to be a transfer to one person. So at no time did he explain anything to me." (Gov. Ex. Transcript F.) The CS explained that he had opened the Wells Fargo bank account in Arizona for her to deposit the entire $50,000 into. Defendant said to him "I'm not going to send more than one … I wouldn't

6

send more than … eight thousand dollars to the …. (*Id.*) Defendant further explained: "The bank can't … "You can't have transactions of more than ten thousand dollars in a twenty-four hour period." (*Id.*)

Similarly, Defendant explained her experience with depositing money to bank accounts and why she was not happy with where the undercover account was opened in an August 15, 2012 conversation with the CS. During that recorded conversation, Defendant said:

> Yeah, not a problem. Yes, yes, I understand. The thing is that, as I said, I didn't want to show them anything of mine … That's why I was asking you if you had other numbers where, where it could be done. It could … maybe be with the rivals [competing banks] of the, of the Chivas … America, you know? Or the blue one. With any of those I can put as much as I want without a problem. But with this one, I don't know why they've given me so much … I've always been able to do it with no problem, but not they want…"

(Gov. Ex. Transcript G.)

Defendant also discussed her prior money laundering activities with the CS in a recorded conversation from September 19, 2012. During this conversation at Defendant's store, she told the CS:

> No, but I … to everyone. In fact, I do a lot of them [inaudible] write it down on paper, but they never take the receipt. All they take is the confirmation code, the sender, the receiver, and the name of the bank. That is all they take, and it's due to the same reason, because I don't want them to …. Because later they go to get the money … because they don't pay attention.
>
> A friend of mine was caught about a year and a half or two years ago. They caught him with a notebook, he got caught with receipts, he got caught with everything…. [T]hey charge them, uh, they still charge them even if the drug is not there.

(Gov. Ex. Transcript L.)

These conversations, in addition to her behavior during some of the conversations, provide further proof of Defendant's predisposition. Indeed, during several conversations introduced at trial Defendant used code language to discuss her activities or expressed her concern about having such conversations on the telephone demonstrating that she had experience

7

in the area. Viewing this evidence in the light most favorable to the government, the government met its burden at trial of proving Defendant's predisposition beyond a reasonable doubt.

## 2. Inducement

The government also proved beyond a reasonable doubt that law enforcement officers or their agents did not persuade or otherwise induce Defendant to commit the offense. As the Seventh Circuit recently clarified:

> [I]nducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. Instead, inducement means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts.

*Mayfield*, 771 F.3d at 434-35. In determining whether the government induced a defendant, relevant factors include repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts. *Id.* at 435.

Defendant argues that the evidence showed that she "repeatedly turned away the government's undercover agent when he attempted to give her cash to deposit." (R. 127 at 3.) She further contends that the confidential informant's enlisting of her friend, Lupe, was further evidence of inducement. The Court disagrees.

At trial, Officer Huertas testified that at no time during his numerous interactions with Defendant did she express any reluctance or hesitation to participate in the money laundering scheme. Indeed, she was "very demanding, calm, but very smart about what she was doing". Officer Huertas testified that he went to Defendant's place of business on approximately July 19,

8

2012 in his undercover capacity with $50,000 in undercover funds in an orange backpack after the CS had arranged the laundering with Defendant. Law enforcement agents were also conducting surveillance at Defendant's place of business. Gallardo asked him for the bank account numbers where he wanted to transfer the money and he provided this information. Officer Huertas told Defendant that he wanted to transfer $50,000 to Phoenix, Arizona to one account at Well Fargo Bank ending in 9554. That account was the undercover bank account. When Officer Huertas told Gallardo that he wanted to deposit the entire $50,000 into the 9554 Account, Defendant Gallardo told him that she would not send that much money to one bank account. (Gov. Ex. Transcript D.) As Officer Huertas testified, Defendant did not want to send the entire $50,000 to one bank account because she thought it was too risky because she would have to complete a government form for all transfers in amounts greater than $10,000. Officer Huertas never understood Defendant to say that she would not launder the money – she was just afraid of the risks given the single account and the amount involved. In fact, he testified that Defendant was "very smart at what she was doing. She was making sure that I was not the police." Officer Huertas then departed her store without giving Defendant the $50,000. He also testified that he did not pressure her or try to convince her to make the deposits.

Shortly after Officer Huertas left Defendant's store, the CS contacted Defendant. On August 1, 2012, the CS and Defendant's friend Lupe went to Defendant's store. Defendant agreed to launder the money during that meeting and Officer Huertas gave the CS a backpack filled with $50,000 in cash for Defendant to launder. Defendant kept her portion and laundered the remaining funds. The evidence does not support inducement.

Regarding Defendant's friend, Lupe, the evidence at trial demonstrated that she was not involved until August 1, 2012 – after Defendant had already committed to laundering the

9

purported drug proceeds.  In addition, there is no evidence that the government solicited Lupe's assistance here.  As Officer Huertas testified, he never told Lupe that he was a law enforcement officer or that the CS was working with him.  He further testified that he never asked Lupe to persuade Defendant to launder the purported narcotics proceeds.  There was no evidence that the CS told Lupe that he was working with law enforcement.  Furthermore, the transcripts revealed that Lupe barely spoke during the meetings with Officer Huertas and Defendant.  Consistent with the recordings, Officer Huertas testified that Lupe was meek and timid and that she barely spoke during the meetings.  He also testified that he never heard Lupe pressure Defendant to launder the money.  Finally, even if the evidence showed that Lupe told Defendant to launder the money, the Seventh Circuit does not recognize the defense of private entrapment or vicarious entrapment.  *See United States v. Hollingsworth*, 27 F.3d 1196, 1204 (7th Cir. 1994).

## II. Defendant Is Not Entitled to A New Trial

Defendant also seeks a new trial pursuant to Rule 33.  Because the Court did not err, this aspect of Defendant's motion is denied.

### A. Legal Standard

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a); *see also Berg*, 714 F.3d at 500; *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion); *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005).  "'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'"  *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004)

(quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

"'A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" *Eberhart*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). The court may grant a new trial if the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required in the interest of justice.'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."); *see also United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). Put another way, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)). *See also United States v. Presbitero*, 569 F.3d 691, 706 (7th Cir. 2009).

### B. The Court Did Not Err in Admitting Portions of the January 31, 2013 Recorded Conversation

Defendant argues that she is entitled to a new trial because the Court erred when it admitted certain portions of a January 31, 2013 recorded conversation (the "January 2013 Conversation") between Defendant and the undercover agent. Because the portion of the conversation the Court admitted was direct evidence of an element in the case, namely, Defendant's knowledge, the Court properly admitted it.

In advance of trial, the government moved in limine to admit portions of the January 2013 Conversation between Gallardo and an undercover law enforcement officer. The January

2013 Conversation contained two specific categories of statements relevant to the motion. First, Defendant and the undercover agent discussed Defendant's prior money laundering activities with the CI and Defendant's intention to launder additional money in the near future. Second, during the January 2013 Conversation, Defendant asked the undercover agent if he could provide her with narcotics to sell, and they discussed the price, quality, and quantity of the drugs. The Court granted the government's motion as to the first category and denied it as to the second category. Even though the evidence in the second category met the standards of Rule 404(b), the Court precluded the government from admitting the conversation in which Defendant and the undercover agent discussed Defendant purchasing narcotics pursuant to Rule 403. (R. 93, Memorandum Opinion and Order). *See United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc) *(citing United States v. Reed,* 744 F.3d 519, 524-25 (7th Cir. 2014)).

The first category of statements with the undercover agent was direct evidence of the charged money laundering counts in the indictment. The Court did not admit this evidence pursuant to Rule 404(b) but instead admitted it as evidence of the charged crime. Indeed, "'Rule 404(b) is inapplicable where the 'bad acts' alleged are really direct evidence of an essential part of the crime charged.'" *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) (quoting *United States v. Lane*, 323 F.3d 568, 579 (7th Cir. 2003)). "Rule 404(b) is not concerned with direct evidence of a charged crime." *United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011).

Specifically, in the first part of the January 2013 Conversation, the undercover agent informed Defendant Gallardo that the confidential informant was "no longer in the picture," and Gallardo responded by confirming the financial transactions that she performed for the confidential informant: "[b]ut I was gonna start telling [the confidential informant], 'listen don't

12

forget all of the money that I [unintelligible] to you, and all of the money that I'm sending to the accounts that you gave me.'" Gallardo also stated that she tried to reach the confidential informant regarding the receipts of the transactions: "I tried calling him back … 'I tried calling you many times, and I asked you if I should throw away the receipts.'… And I told him, I said, 'you know what, I'm just gonna throw them away. I don't want to save stuff here, 'cause, shit if anything ever happens [unintelligible].'" Later in the conversation with the undercover agent, Defendant stated that the confidential informant had told her that "next time" the confidential informant was not going to pay her, and was going to instead give her "work" to compensate her. Finally, the undercover agent told Gallardo that "in a couple of weeks I'm gonna have more money [to be laundered]…[i]t's gonna be awhile, 'cause I still got a lot of work [narcotics] out there, that's…the money is still there [tied up in the narcotics]." The undercover agent then said, "[h]owever you want payment, too. Don't matter to me … I'd rather have you deposit all the money and give you work [narcotics], because … it's a lot easier for me." Gallardo responded by saying "okay." (R. 70, at 5-7.)

This portion of the January 2013 Conversation was direct evidence of the charged money laundering counts. As the Court previously ruled:

> First, Gallardo references sending money to the accounts given to her by the confidential informant, and throwing away receipts of the transactions. Both of these statements reference the charged transactions and thus are directly relevant to the charged counts. In response, Gallardo argues that "work" does not necessarily mean narcotics, and that she had a legitimate reason for stating that she was going to throw away the receipts. These arguments, however, go to the weight of the evidence, not its admissibility. *See* Fed. R. Evid 401; 402. Defendant is free to make these arguments to the jury. In addition, Defendant's statement that she did not want to keep the receipts "if anything ever happens" is relevant to her knowledge and state of mind. Finally, Gallardo does not articulate how she will be unfairly prejudiced by this evidence, and the Court does not otherwise find that its probative value is substantially outweighed by the danger of unfair prejudice under Rule 403.

Second, in the proffered conversation Gallardo does not appear to be surprised by either the confidential informant's prior statement that he was planning to pay her with narcotics, or the undercover agent's request for her to launder additional drug proceeds. Gallardo's statements are relevant to show that she believed the funds that she is charged with laundering were the proceeds of illegal activity, which is an element of the charged crime. *See* 18 U.S.C. § 1956(a)(3) (the financial transaction must "involv[e] property represented to be the proceeds of specified unlawful activity"); *United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000) (holding that under § 1956(a)(3) the government must prove that the defendant believed the property at issue "to be the proceeds of specified unlawful activity such as dealing in narcotics…"); *United States v. Kaufmann*, 985 F.2d 884, 892 (7th Cir. 1993) (holding that under § 1956(a)(3) the government must prove "that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds"); *United States v. Stratievsky*, 430 F.Supp.2d 819, 825 (N.D. Ill. 2006) (finding that under § 1956(a)(3), "[t]he Government must prove…that the [informant] made, and the [d]efendant[] believed, the predicate representation that the funds were proceeds of specified illegal activity.") Although Gallardo argues that her knowledge as of the date of the January 2013 Conversation does not bear on whether she believed the funds were drug proceeds when she initially deposited them several months earlier, the Court disagrees. As the government notes, the way in which Gallardo "casually and freely talks about narcotics trafficking and her willingness to accept narcotics for money laundering" in the January 2013 Conversation is relevant to whether she believed that the funds she accepted in August and September of 2012 were drug proceeds at the time she accepted them. (R. 87, Gov. Reply, at 3-4.) She also specifically references the charged transaction during the conversation. Gallardo is free to argue that this conversation does not show that she believed in August and September of 2012 that those funds were drug proceeds, but that is a question for the jury. The Court also does not find that the probative value of this portion of the conversation is substantially outweighed by the danger of unfair prejudice under Rule 403 because these statements are direct evidence of an element of the offense, and Gallardo does not show that their introduction into evidence would unfairly prejudice her. *See United States v. Eads*, 729 F.3d 769, 777 (7th Cir. 2013) ("Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is *unfair*") (quoting *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011)).

(R. 93, Memorandum Opinion & Order).

These admitted portions of the January 2013 Conversation constituted direct evidence of the charged money laundering because Defendant Gallardo said that the CI had told her that "next time" he was not going to pay her and was going to instead give her "work" to compensate her. The reference to "next time" was an admission regarding the charged money laundering offenses. Moreover, the statement about receiving "work" in lieu of money was relevant to

14

establishing an element of the offense, namely that Defendant believed the funds that she was charged with laundering were the proceeds of narcotics trafficking. *See United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000) (holding that under § 1956(a)(3) the government must prove that the defendant believed the property at issue "to be the proceeds of specified unlawful activity such as dealing in narcotics…"). As such, the Court did not err in admitting this evidence.

Defendant's Rule 403 argument also fails. As the Court specifically held, the probative value of this portion of the conversation was not substantially outweighed by the danger of unfair prejudice under Rule 403 because these statements constituted direct evidence of an element of the offense. Defendant fails to demonstrate how their introduction into evidence unfairly prejudiced her. *See United States v. Eads*, 729 F.3d 769, 777 (7th Cir. 2013) ("Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is *unfair*") (quoting *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011)). The Court denies this aspect of the motion.

## CONCLUSION

For the reasons discussed in detail above, the Court denies Defendant's motion for a judgment of acquittal or, in the alternative, a new trial.

**Dated:  June 1, 2015**                                              **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge

15